UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN KEYSE, | ) | CASE NO. 1:19-CV-02495-DAR |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Kathleen Keyse (Plaintiff), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying her applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 12). For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

## I.  Procedural History

Plaintiff applied for DIB on April 7, 2014, alleging a disability onset date of December 11, 2012. (R. 10, Transcript (Tr.) 199). Plaintiff listed the following medical conditions: fibromyalgia, inflammatory arthritis, anxiety/depression, sleep apnea, IBS, chronic fatigue, GERD, euythmia, cyst on spine, and diabetes. (Tr. 224). The application was denied initially and upon

reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 155-56). Plaintiff participated in the hearing on March 26, 2016, was represented by counsel, and testified. (Tr. 34-103). On April 11, 2016, the ALJ issued an unfavorable decision. (Tr. 17-29). Plaintiff appealed to federal court and on September 27, 2018, the court concluded that the Commissioner's decision was not supported by substantial evidence and remanded for further consideration of the treating physician's opinion. (Tr. 1298).

In the interim, on July 27, 2017, Plaintiff filed a second DIB claim, with an alleged onset date of April 12, 2016. (Tr. 1393). Plaintiff listed the following medical conditions in support of her application: fibromyalgia, non discriminatory inflammation arthritis, spinal stenosis, foot pain, hand and arm pain, anxiety and depression, hoarding, chronic fatigue, stroke 3/10/17, congestive heart failure. (Tr. 1420). On March 15, 2019, the Appeals Council (AC), noting the federal court's remand, ordered the new application consolidated with the earlier claim and remanded the matter to the ALJ for further proceedings consistent with the order of the court. (Tr. 1303).

The ALJ conducted a supplemental hearing on July 31, 2019, during which Plaintiff was represented by counsel and testified. (Tr. 1205-23). A vocational expert and a medical expert also testified. (Tr. 1205-23). On August 22, 2019, the ALJ denied Plaintiff's claims. (Tr. 1181-95).

The ALJ's decision became the Commissioner's final decision on October 22, 2019, 61 days after the date of the decision. 20 C.F.R. § 404.984(a), (c), (d). On October 25, 2019, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing. (R. 15, 17, 18).

## II. Evidence

### a. Relevant Medical Evidence[1]

#### 1. Evidence Related to Physical Impairments Prior to ALJ 2016 Decision

With respect to evidence submitted before the ALJ's 2016 decision, the court incorporates the following summary of the facts[2] from Plaintiff's previous appeal to federal court.

> Keyse presented to Judith D. Manzon, M.D., on February 28, 2012, complaining of leg pain, radiating down to the knees. (R. 9, tr., at 554.) She also reported swollen joints, both her great toes and her shoulders. *Id.* On examination, claimant had tenderness of the lateral hips and leg muscles, discomfort with rotation of both hips, and flexion of the left hip, although she had full range of motion ("ROM"). *Id.* at 555. The doctor administered an injection of Kenalog and Lidocaine in her hip. *Id.* at 556-557.

> Keyse returned to Dr. Manzon for a follow-up visit on June 20, 2012. (R. 9, tr., at 358.) Keyse reported that her pain was essentially unchanged since her previous visit. *Id.* She develops lateral hip pain radiating down the lateral thigh and into her knees. *Id.* at 358-359. Lodine tablets helped with the pain. *Id.* at 359. The injection for pain at the earlier visit only provided about two weeks of relief. *Id.* On examination, Keyse had tenderness of the chest wall, lateral hips and thighs, hamstrings, and arm and leg muscles. *Id.* at 360. Tylenol adequately controls her pain. *Id.* at 362. Her medications were continued at the current dose. The doctor had recommended physical therapy, but reported that patient only went to one session. *Id.* The doctor recommended increased walking. *Id.*

> Keyse presented to Joseph Knapp, M.D., on August 30, 2012, for a comprehensive follow-up appointment. (R. 9, tr., at 369-373.) Dr. Knapp reported that Keyse had been "generally doing okay" since her last visit with him four months prior, except for some increased swelling in her legs, which showed 1 to 2+ edema. *Id.* at 369-370. Dr. Knapp noted a history of pulmonary hypertension and congestive heart failure. *Id.* at 370. The claimant also had hypertension, but was doing well on her current regimen, hyperlipidemia, ongoing thyroid issues, and diabetes. *Id.*

> During a September 12th follow-up appointment with Dr. Knapp, Keyse reported

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

[2] Due to the court's previous determination that the ALJ failed to properly consider Plaintiff's treating physician's opinion, the court limited its recitation of the facts to the Plaintiff's physical conditions. Evidence regarding Plaintiff's mental health will be set forth below.

that her swelling was going down, but she had 1 to 2+ edema on her right leg, with some erythema on the mid-shin, and trace to 1+ edema on the left leg. (R. 9, tr., at 381-382.) Dr. Knapp noted that her leg pain could be secondary to lumbar stenosis, given her current symptoms; he ordered a lumbar MRI and increased her Lyrica to treat her symptoms. *Id.* at 382.

On September 26, 2012, Keyse had a physical therapy spine evaluation. (R. 9, tr., at 387-392.) The physical therapist (PT) Margo Aprile recorded that Keyse was seen for bilateral leg pain for the past year, worsening in the previous month. *Id.* at 387. The pain was intermittent, described as "burning, throbbing, aching, radiating." *Id.* The pain was worse with rising or standing, walking, getting in and out of a car, and climbing stairs. *Id.* The PT recorded no functional limitations. *Id.* The patient's goal was decreased pain when standing or walking. *Id.* The PT assessed that claimant's symptoms were consistent with spinal stenosis. *Id.* at 389. One PT session per week for four weeks was planned. *Id.* at 389-390.

Keyse reported, at a December 18, 2012, follow-up appointment with Dr. Knapp, that she recently had a thyroidectomy, but "she has generally been in her usual state of health." (R. 9, tr., at 428.) The doctor's objective assessment was normal, with no edemas. *Id.* at 429.

Keyse also saw Dr. Manzon on December 18 for a routine follow-up for her "presumed undifferentiated inflammatory arthritis." (R. 9, tr., at 420.) Keyse described pain in her arms, including her elbows, her wrists and shoulders, her great toes, and her left lateral hip and knee. *Id.* at 421. Tramadol keeps her pain manageable. *Id.* The pain was most bothersome in her left hip and leg, but not so much that she felt the need to resume Lodine. *Id.* There was no evidence of active inflammatory arthritis at that visit; the primary source of her pain appeared to be fibromyalgia and osteoarthritis. *Id.* at 424.

On April 22, 2013, Keyse saw Dr. Knapp and reported her lateral epicondylitis was better, but she still had back pain and pain radiating down her left leg. (R. 9, tr., at 454; *see also* 446-447 (diagnosed with lateral epicondylitis (tendonitis) of elbow.)) At a May 7 follow-up, Keyse again complained of back pain and pain down her left leg. *Id.* at 460. X-rays of her back were performed that date, and revealed mild degenerative disk and facet disease, with normal sacroiliac joints. *Id.* at 461, 464.

Keyse received a lidocaine injection in her left hip on June 12, 2013. (R. 9, tr., at 321-322.) She reported to Dr. Manzon during a routine follow-up on June 19, 2013, that the injection provided 75% improvement in her left leg pain, but her anterior thigh pain remained unchanged. *Id.* at 477. She had no other complaints or new symptoms. *Id.*

On referral, Keyse visited rheumatologist Carmen E. Gota, M.D., on July 12, 2013, for an opinion on her pain. (R. 9, tr., at 658-675.) On physical examination, Dr.

Gota found Keyse in no acute distress, with no swollen joints, normal lumbar motion and lordosis. *Id.* at 665. Her ROM in shoulders and hips was without pain. *Id.* Dr. Gota found eleven or more tender points with pressure. *Id.* at 666. Neurological exam found normal strength and sensation. *Id.* Dr. Gota diagnosed fibromyalgia, but doubted Keyse had an inflammatory condition. *Id.* at 667. The doctor also diagnosed fatigue, excessive sleepiness, moderate depression and anxiety. *Id.* Dr. Gota stressed the importance of graded low intensity aerobic exercise, and sleep and mood conditioning. *Id.*

During a September 20, 2013, follow-up with Dr. Knapp, Keyse reported that she had been diagnosed with sleep apnea, but questioned the need for a CPAP. (R. 9, tr., at 491.) She also complained of persistent fatigue, joint pain, and low back pain which radiates down her legs. *Id.* Dr. Knapp's recommendation was to pursue the CPAP and assess whether her symptoms are improved. *Id.* at 492. The doctor noted her hypertension was stable; she had overall arthropathy, inflammatory versus fibromyalgia; and possible lumbar stenosis. *Id.* On September 30, upon recommendation by Dr. Knapp, an MRI of the lumbar spine was done, and degenerative disc changes were noted, greatest at the L4/5 with a synovial cyst impinging on the L5 nerve root. *Id.* at 497-498.

Keyse had laparoscopic gastric sleeve surgery in November 2013. She reported to Dr. Knapp on November 25, 2013, that her lumbar stenosis issues persisted. (R. 9, tr., at 584-585; *see generally* 282-284.)

On December 2, 2013, Keyse presented to Prudencio Balagtas, D.O., and Eric A.K. Meyer, M.D., at the Center for Spine Health. (R. 9, tr., at 676-677.) The patient was there to discuss her MRI results in relation to her low back and leg pain. *Id.* at 676. Dr. Balagtas recorded that Keyse had non-antalgic gait, adequate neck ROM, normal reflexes, and normal lumbar ROM with no pain. *Id.* at 677. The claimant had normal muscle examination, with no atrophy, but tenderness in her lower back. *Id.* The MRI revealed disc degeneration worst at L3-L4, L4-L5, with facet anthropy, and a small synovial cyst not consistent with her pain. *Id.* The doctor told Keyse she expected her back and leg pain to improve as she lost weight. *Id.*

At a January 10, 2014, follow-up visit with Dr. Knapp, Keyse reported that "for the most part she has been feeling well," and she continued to lose weight after her gastric procedure. (R. 9, tr., at 622.) Her fibromyalgia and arthritic issues were reasonably stable. *Id.*

In the spring of 2014, Keyse pursued a course of ten occupational therapy sessions. (R. 9, tr., at 850-853.) The therapist reported in an April 7, 2014, "OT Chronic Pain Discharge Summary," that Keyse was discharged because she had made good progress and reached most of her goals, including the ability to occasionally lift and carry twenty to fifty pounds. *Id.* at 850-851. She was able to complete such tasks as carry ten pounds of groceries while climbing steps, to carry a full laundry basket,

to vacuum, wash dishes, clean tubs, and make the bed. *Id.* Keyse was able to tolerate twenty minutes of simulated driving, and forty-five minutes of sitting at a computer. *Id.* at 851.

That same Spring 2014, Keyse also successfully completed a course of seventeen physical therapy sessions. (R. 9, tr., at 846-849.) The therapist noted: "She achieved 45 min/day of physical therapy exercise with good tolerance." *Id.* at 846. Keyse was able to do twenty-five minutes of biking at an aerobic pace. *Id.*

During a May 2, 2014, appointment with Mary Patterson, CNP, Keyse was doing well, staying active and engaged with family and friends. (R. 9, tr., at 803.) She stated her average pain level was 4, and Nurse Patterson stated her Pain Disability Index was 49/70, "suggesting severe functional impairment; however she describes herself engaged in social activities with family and friends. Exercising regularly and volunteering in church." *Id.*

Keyse reported to Dr. Knapp at a June 18, 2014, visit that she had pursued rehabilitation for her chronic pain issues, and that some of the medication had helped, while others had not. (R. 9, tr., at 880.) She mentioned that she had applied for disability. *Id.* Keyse's hypertension was stable and well-controlled, and she had an appointment scheduled with rheumatology the following week. *Id.* at 881.

During a June 24, 2014, appointment with Dr. Manzon, the doctor noted that the primary source of her pain appeared to be fibromyalgia and osteoarthritis. (R. 9, tr., at 871.) Keyse reported that her pain was manageable the majority of the time, but the doctor suggested a prescription for the days when her pain is not adequately controlled. *Id.*

On July 14, 2014, treating physician Dr. Knapp completed a physical capacity evaluation. (R. 9, tr., at 794-796; *see also id.* at 904-906 (duplicate).) Dr. Knapp marked the form to indicate that Keyse could stand or walk two hours per workday, sit for three hours a day, and could occasionally lift up to twenty pounds. *Id.* at 794. The doctor marked that Keyse could use her hands for pushing and pulling, but not for simple grasping or fine manipulation. *Id.* He opined that claimant could occasionally bend, climb, and lift overhead, but never crawl. *Id.* at 795. The doctor also marked that Keyse would not be able to function without rest breaks in excess of the norm, and would miss or be unable to complete the workday five to ten days per month. *Id.* Dr. Knapp indicated that the claimant's pain or other symptoms would interfere with her ability to concentrate and maintain task performance. *Id.* at 796.

On August 6, 2015, Keyse returned to physical therapy for a low back evaluation. (R. 9, tr., at 1006-1014.) Keyse reported to the PT that her low back pain and leg pain had worsened in the past several months. *Id.* at 1006. Her tolerance for standing was stated as 1-1.5 hours, and walking for 45 minutes, both with pain. *Id.*

Keyse characterized her pain as 4/10, and the duration as constant. *Id.* Examination revealed that she had minimal limitation in her lower back ROM, and that she had full strength and ROM in her hips and legs, except slightly reduced strength at the ankle and left hip. *Id.* at 1008. Keyse had tenderness in her lower back, at L4/5. *Id.* at 1009. The PT recommended six physical therapy sessions to decrease pain, improve sleep, and improve lumbar ROM. *Id.* at 1010.

Dr. Knapp completed a second physical capacity evaluation on February 3, 2016. (R. 9, tr., at 1170-1171.) The doctor's diagnosis of Keyse was "chronic back pain, lumbar spinal stenosis, pain in both [legs], hand numbness, fibromyalgia," and her primary symptoms were "back pain, hand pain and numbness, foot pain." *Id.* at 1170. Dr. Knapp opined that Keyse could stand or walk 30-45 minutes at a time, and would need to rest for 10-15 minutes after doing so. *Id.* He also stated that Keyse could sit 30-45 minutes at a time, and would need to rest for 5-10 minutes afterwards. *Id.* The doctor marked that the claimant can repeatedly lift up to ten pounds. *Id.*

Dr. Knapp also indicated that, on most days, Keyse could occasionally reach, and push and pull, with both arms, and handle and finger with both hands. (R. 9, tr., at 1170-1171.) He indicated that the claimant can never squat or crawl, but can occasionally bend, climb, and use foot controls. *Id.* at 1171. Dr. Knapp opined that Keyse would often require additional breaks during a workday in excess of the norm, and would experience four days or more per month during which her symptoms would prevent her from completing an eight hour work shift. *Id.*

The state agency medical consultants provided physical RFC assessments as well. On June 3, 2014, Rachel Rosenfeld, M.D., stated that Keyse was capable of lifting or carrying twenty pounds occasionally, and ten pounds frequently; she could stand or walk about six hours of an eight-hour workday, and sit for about six hours of a workday; and she was otherwise unlimited in her ability to push or pull. (R. 9, tr., at 121-122. On reconsideration, Maureen Gallagher, D.O., M.P.H., assessed the same exertional limitations on September 23, 2014. *Id.* at 135-136 Dr. Gallagher based the exertional limitations on claimant's arthritis, fibromyalgia, and obesity. *Id.* at 136.

(Tr. 1282-1290).

## 2. Evidence Related to Physical Impairments Since 2016 Decision

Plaintiff continued to treat her physical impairments after the ALJ's April 2016 unfavorable decision. In May of 2016 she treated with pain specialist Dr. Girgis at the referral of her rheumatologist, Dr. Manzon, for a medical opinion regarding the evaluation and management

of Plaintiff's all over body pain. (Tr. 3052). Plaintiff indicated that the she had pain all over her body, and that she was currently experiencing pain at a level four on a one to ten scale. (*Id.*). At best, her pain level was two and at worst it was eight. (*Id.*). Plaintiff reported that the pain was aggravated by sitting, standing, forward flexion, lifting, getting up from sitting, lying down and walking. (*Id.*).

Dr. Girgis recommended discussing with Plaintiff's psychiatrist about changing medication from Brintellix to Savella for her fibromyalgia pain. (Tr. 3059). Dr. Girgis also recommended bilateral lumbar facet medial branch nerve blocks two weeks apart, physical therapy with deep tissue massage, TENS unit. (*Id.*) He also prescribed Zanaflex. (*Id.*).

On December 31, 2016, Plaintiff's insured status for Title II benefits expired.[3] (Tr. 1183).

### 3. Medical Opinions Related to Physical Limitations Since 2016 Decision

On September 19, 2017, Dr. Timothy Budnik, D.O., reviewed the record and opined that prior to Plaintiff's date last insured of December 13, 2016, Plaintiff was limited to light exertion. (Tr. 1262). She could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; sit, stand and/or walk for about six hours in an eight-hour workday; frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; and should avoid unprotected heights, moving machinery and commercial driving. (Tr. 1258-59). On November 29, 2018, Dr. Abraham Mikalov M.D., reviewed the record and assessed the same limits as Dr. Budnik. (Tr. 1271-1273).

---

[3] The record indicates that Plaintiff suffered a stroke in March of 2017. Because this occurred after her last date insured, it is not relevant herein.

Dr. Knapp prepared a third Physical Capacity Evaluation on November 6, 2018. (Tr. 2971-72). Dr. Knapp opined that Plaintiff could stand/walk for 15-30 minutes at a time and would then need to sit down for 10-15 minutes. (Tr. 2971). In an eight-hour workday, Plaintiff could stand/walk for a total of two to four hours; sit for 15-30 minutes at a time and then would need to stand and move around for 10-15 minutes; and sit for less than two hours. (Tr. 2971). Plaintiff could lift up to ten pounds. (Tr. 2972). In addition, Dr. Knapp opined that Plaintiff would frequently require breaks during the workday and would likely experience four or more bad days per month when her symptoms would increase, and she would be unable to complete an eight-hour workday. (Tr. 2927).

### 4.    Evidence Related to Mental Health Impairments

Plaintiff has history of mental health issues and began group therapy sessions led by Dr. Lillian Gonsalves in November 2012. (Tr. 778). Dr. Gonsalves, in November 2012, assessed a GAF score of "60-51 Moderate symptoms or moderate difficulty in social, occupational or school functioning." (Tr. 786). Dr. Gonsalves further noted that Plaintiff experienced "problems with primary support group[.] Problems related to the social environments and [o]ther psychosocial and environmental problems." (Tr. 786). Plaintiff also began treating with Sara Staneff, MA, licensed clinical psychologist (LCP), in November of 2012. (Tr. 726).

In February 2013, Plaintiff reported to Dr. Gonsalves that she had a long history of major depression, and that she had multiple medical conditions and a great deal of stress at home. (Tr. 778). Plaintiff reported that since her last visit she gave up her teaching position for the semester because she felt she could not be in clinicals as early as she should. (Tr. 778). She reported feeling flat, and so she was switched from Effexor to Cymbalta. (Tr. 778). Plaintiff's GAF score was 50, indicating "serious symptoms or any serious impairment in social, occupational or school

functioning." (Tr. 780). In April 2013, Plaintiff reported that she remained active in therapy, and that her home was stressful. (Tr. 772). She reported increased irritability on Cymbalta but that she did not feel as "flat." (Tr. 772). Plaintiff's medication regimen was unchanged. (Tr. 773).

Plaintiff followed up with Dr. Gonsalves in November 2013 and reported that she was scheduled for bariatric surgery the following week. (Tr. 755). Plaintiff reported switching back to Effexor from Cymbalta due to side effects and cost, she stopped other medications in preparation for the gastric sleeve surgery, and she noted pain from fibromyalgia. (Tr. 755).

Plaintiff attended regular, individual counseling sessions with Ms. Staneff throughout 2014 and 2015. (Tr. 1076-85).

On January 14, 2014, Plaintiff reported to Dr. Gonsalves that she was feeling "good and bad"; she had lost weight from the bariatric sleeve surgery, but she continued to complain of poor sleep, fatigue, lack of motivation, and pain. (Tr. 749). Plaintiff reported that was looking into the Pain Management Program, and Dr. Gonsalves deferred adjusting her medications in the event that the Pain Program made recommendations. (Tr. 749).

Plaintiff completed the Chronic Pain Rehabilitation Program on May 2, 2014. (Tr. 803). On May 20, 2014, Dr. Gonsalves noted that her medication was adjusted in the program, in part due to side effects and financial issues. (Tr. 743).

Dr. Sara Zuchowski, psychiatrist, evaluated Plaintiff on July 24, 2015. (Tr. 1062). Plaintiff reported a history of depression and anxiety and explained that she wanted to transfer care from Dr. Gonsalves, with whom she previously attended only group therapy sessions, noting that she did not feel a good connection. (Tr. 1062). Dr. Zuchowski diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and rule out hoarding disorder. (Tr. 1064). She continued Plaintiff on Effexor and started her on Abilify; she also recommended that Plaintiff

continue with counseling. (Tr. 1065).

Plaintiff continued regular treatment with Dr. Zuchowski beyond her last insured date in December of 2016. (Tr. 1056-61; 2942-64). Dr. Zuchowski's treatments notes indicate that she regularly modified Plaintiff's medications based upon side effects, the current nature of her symptoms, and/or due to interactions with medications she was taking for her physical impairments. (e.g., Tr. 1056, 58, 60, 61; 1839, 58, 68, 86, 92; 2951, 53-58).

### 5.     Opinion Evidence Related to Mental Health Impairments

#### a)      Dr. Sara Zuchowski

On February 4, 2016, Dr. Zuchowski, Plaintiff's current treating psychiatrist, completed a medical source statement regarding Plaintiff's mental impairments. (Tr. 1172). Dr. Zuchowski diagnosed major depression, recurrent, moderate; generalized anxiety disorder; and fibromyalgia. Her symptoms were: low motivation, depressed mood, anxiety, low energy, irritability, poor concentration, sleep disturbance, poor short-term memory, and easy distractibility. *Id.* Dr. Zuchowski noted that Plaintiff occasionally isolates to avoid social interaction, she often has difficulty maintaining activities of daily living, managing even a low stress situation, and maintaining concentration, persistence, and pace. *Id.* Dr. Zuchowski opined that Plaintiff experiences more than seven bad days per month during which her symptoms are increased and she would not be able to complete an eight-hour work shift. *Id.*

On September 28, 2017, Dr. Zuchowski completed a second opinion, noting that Plaintiff had major depressive disorder, recurrent, moderate; generalized anxiety disorder; and hoarding, all of which are ongoing. (Tr. 2118). Plaintiff was taking Ativan for anxiety, but she was not able to tolerate the antidepressant medications, and low self-esteem and anxiety resulted in difficulty with social interaction and adaptation. *Id.* Dr. Zuchowski opined that

Plaintiff could probably do simple tasks so long as her physical pain was under control. (Tr. 2118).

On October 26, 2018, Dr. Zuchowski completed a third opinion, listing Plaintiff's primary mental symptoms as low mood, low energy, and low motivation. (Tr. 2967). Dr. Zuchowski noted that she occasionally observed Plaintiff with an anxious demeanor and some dysphoria. (Tr. 2967). She opined that Plaintiff has moderate limitations in her abilities to respond appropriately to supervision, criticism, and redirection, and to concentrate, persist and complete tasks; and has marked limitations in her abilities to adapt and manage oneself, and understand, remember or apply information. (Tr. 2967-68). Her mental impairments are "persistent", but she can adjust and can adapt to changes in her environment. (Tr. 2968-69). Dr. Zuchowski opined that Plaintiff will likely have four or more bad days per month during which her symptoms are increased and she would not be able to complete an eight-hour workday. (Tr. 2696).

<b>b)      Dr. Lilian Gonsalves</b>

Dr. Gonsalves, Plaintiff's former treating psychiatrist, completed a Mental Status Questionnaire on July 14, 2014. (Tr. 791-93). Dr. Gonsalves diagnosed Plaintiff with major depressive disorder, mild to moderate, which started in 2006; and noted that Plaintiff has tried multiple anti-depressants and attended a chronic pain rehabilitation program. (Tr. 791). Dr. Gonsalves opined that Plaintiff has mild impairments in social functioning and concentration, persistence and pace, and no limitations in activities of daily living. (Tr. 792-93). She recommended that Plaintiff pursue a part-time, less emergency nursing position, such as teaching, case management, or community outreach. (Tr. 908).

12

### c) Sarah Staneff, LCP

Plaintiff began treating with Ms. Staneff, LCP, on November 2, 2012. (Tr. 726). On May 21, 2014, Ms. Staneff completed a Mental Status Questionnaire and Daily Activities Questionnaire. (Tr. 726-30). On the Mental Status Examination, Ms. Staneff noted that Plaintiff made light of issues that were difficult for her. (Tr. 726). Plaintiff's mood and affect was depressed and overwhelmed about interpersonal relationships and her physical environment. *Id.* Regarding her anxiety, Plaintiff was extremely anxious and could not deal with arguing and conflict in her home; she became overwhelmed by detail and tended to minimize difficulty of conflict until her feelings were elicited. *Id.* Regarding cognitive functioning, Plaintiff was able to concentrate in the therapy environment but was easily distracted by demands and activities in her daily living environment. *Id.* Regarding insight and judgment, Plaintiff inhibited her own expressions of anger and had difficulty asserting herself when others posed disagreement; she submitted to others or over accommodated when conflict arose and had ineffective judgment in that respect. *Id.* Plaintiff was diagnosed with major depression, single episode, severe. (Tr. 727). Ms. Staneff opined Plaintiff was able to remember, understand and follow directions; had fair ability to maintain attention but difficulty when interpersonal conflict occurs; could maintain concentration, persistence and pace in the work environment outside of home; and could perform simple, routine, repetitive tasks, but was limited in lifting and standing for long periods. *Id.*

Regarding the Daily Activities Questionnaire, Ms. Staneff indicated that Plaintiff visits with family and friends on a weekly basis, and that she was overwhelmed by supervising students and paperwork in her prior job. (Tr. 729). She considered part-time work, but realized lifting and standing were required. *Id.* She has poor interpersonal stress tolerance and difficulty standing and lifting. *Id.* Her ability to perform household chores is very limited in lifting activities; she can

13

manage her personal hygiene, shopping, driving, and hobbies, but has limited financial resources and problems paying bills. (Tr. 730). She receives limited cooperation from family. *Id.* Plaintiff reliably attends therapy sessions two times per month, but has difficulty implementing the strategies discussed in therapy due to poor family functioning. *Id.*

On October 23, 2014, Ms. Staneff completed a Second Daily Activities Questionnaire, which was consistent with the May 21, 2014 Questionnaire. (Tr. 900; 902). Ms. Staneff also completed a Second Mental Status Questionnaire. (Tr. 895-896). She opined that Plaintiff's mood was periodically depressed with feelings of anxiety regarding relationships and her physical environment. (Tr. 895). She had difficulty coping with conflict and was overwhelmed by cleaning and organizing her home environment; was able to problem solve, but became anxious in execution of the strategies; and had a fair ability to maintain attention, but difficulty when interpersonal conflict arises. (Tr. 895-96). Ms. Staneff could not assess by observation whether Plaintiff could sustain concentration, persist at tasks, and complete them in a timely fashion. (Tr. 896). She over accommodated others in conflict (social interaction deficiency), and she has difficulty asserting herself and adapts to others' demands (adaptation deficiency). *Id.*

### d) Dr. Kristen Haskins

On November 13, 2014, Dr. Kristin Haskins reviewed the available records. (Tr. 127-29). Dr. Haskins opined that anxiety disorder and affective disorder were severe impairments and that Plaintiff has moderate difficulties in maintaining social functioning and concentration, persistence or pace. (Tr. 133). Dr. Haskins opined that Plaintiff is moderately limited in her abilities to: maintain attention and concentration for extended periods; sustain an ordinary routine without supervision; complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 136-38). In addition, Dr. Haskins opined that Plaintiff could complete simple to detailed tasks in a setting that does not need close sustained focus or sustained fast pace; she can perform tasks with no more than occasional, superficial interaction with others; and she is limited to static tasks in a setting that does not have stringent time or production requirements. (Tr. 137-38).

### e)  Dr. Robyn Murry-Hoffman

On October 20, 2017, Dr. Murry-Hoffman reviewed the available medical records. (Tr. 1253-55). Dr. Murry-Hoffman found depressive disorders, anxiety and obsessive-compulsive disorders, and trauma and stress-related disorders to be severe impairments. (Tr. 1255). She assessed moderate limitations in the areas of interacting with others; concentrating persisting and maintaining pace; and adapting or managing oneself. (Tr. 1256). In addition, she assessed moderate limitations in the abilities to: complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 1260-61). Dr. Murry-Hoffman opined that Plaintiff would have difficulty with fast paced tasks due to symptoms of anxiety; is capable of at least superficial interactions with others; and is capable of handling occasional changes with

advance notice. (Tr. 1260-61). She noted that "[m]oderate impairment was opined by Dr. Haskins (and seems appropriate now) but this was not given weight by ALJ." (Tr. 1261).

### f)      Dr. Vicki Warren

On November 29, 2017, Dr. Warren reviewed the available records and found the following severe impairments: depressive disorders, anxiety and obsessive-compulsive disorders, and trauma and stress-related disorders. (Tr. 1269). She affirmed Dr. Murry-Hoffman's findings regarding the Paragraph B criteria and the mental RFC. (Tr. 1270; 1273-75.)

### B.      Relevant Hearing Testimony

During the March 23, 2016 hearing, Plaintiff testified as follows:

- She is married and has three children. (Tr. 38). She has a driver's license and drives about three times a week. (Tr. 39). She drives to the grocery store, takes her son to work, and drives to her Counselor. *Id.*

- She has a Bachelor of Science in Nursing, but her certification had lapsed, and she has not worked since her disability onset date of December 11, 2012. (Tr. 40). Her last job was at Cuyahoga Community College, teaching a beginning level nursing, clinical rotation in the hospital. (Tr. 41). She supervised eight to ten nursing students and was on her feet the whole time. (Tr. 42). Before this job, she worked as a registered nurse in Ambulatory Surgery at Saint John West Shore Hospital. (Tr. 42). She was on her feet the whole shift. (Tr. 44). She previously worked as a House Supervisor at Life Care Center of Medina, an extended care facility, managing staff and performing nursing services. (Tr. 44-5). Plaintiff further testified about various nursing positions from 2006-2009. (Tr. 45-48).

- Plaintiff has a degenerative lumbar spine condition. (Tr. 50). She went through a chronic pain management program in 2013, had three weeks of physical therapy and took medication for her back pain, but has not had back surgery. *Id.* She was prescribed pain medication, but she stopped due to drowsiness. (Tr. 51).

- Plaintiff has bilateral degenerative joint disease in her big toes; she sees a podiatrist and has shoe inserts, which help with the toe pain, but cause pain on the outside of her feet. (Tr. 52, 54). Her podiatrist has recommended surgery; she takes over the counter medicine for the toe pain. (Tr. 54-5).

- She has a history of hip bursitis, received a left hip injection, and used anti-inflammatory prescriptions. (Tr. 55-6).

- Plaintiff has fibromyalgia, which was diagnosed by her rheumatologist. (Tr. 57). She took Lyrica for a year and a half but stopped because of the sedating effects, and took Plaquenil and anti-inflammatories, mostly on her bad days, because her stomach would not tolerate them on a continuous basis. (Tr. 57).

- Plaintiff was being monitored for diastolic heart failure. (Tr. 58). She had weight loss surgery two years earlier, which lead to weight reduction, improved her congestive heart failure, stabilized her condition and enabled her to discontinue medications. (Tr. 58-9).

- She had pain in her hands, elbows, and shoulders, which impact her ability to work. (Tr. 60). She was diagnosed with undifferentiated inflammatory arthritis. (Tr. 61).

- Back pain was her most significant issue, causing her to adjust constantly her position for comfort. Pain in her hands, shoulders and elbows is increased by doing simple tasks like lifting or opening IV bags. (Tr. 61). She has memory issues that impact staying on task and keeping up with work demands. *Id.*

- Plaintiff can walk about 15 minutes at a time, stand in place about 10 to 15 minutes, sit in place for about a half hour to 45 minutes, and lift 50 pounds. (Tr. 62-63). She could not comfortably lift 50 pounds if she had to do it several times for an hour or all day long, but she could repeatedly lift under ten pounds. (Tr. 78).

- She is in constant pain in her lower back, shoulders, hips, and big toes. (Tr. 63). She has her lower back flare ups daily, which are caused by prolonged standing and lifting, doing dishes, laundry, grocery shopping, pushing a cart, and driving, and can last from a few hours to the whole day. (Tr. 64). She must lie down at least two times a day for about an hour. (Tr. 64)

- She experiences increased hip pain once or twice a month, triggered by prolonged standing or heavy housework, and increased big toe pain about five times a week. (Tr. 65-6).

- Plaintiff has difficulty sleeping, averaging six hours of interrupted sleep a night, necessitating naps during the day. (Tr. 67). She is constantly fatigued because of the fibromyalgia, pain, and poor sleep. (Tr. 68).

- Plaintiff was diagnosed with major depressive disorder and anxiety. (Tr. 69). She testified that her mental impairments were severe enough to limit her focus, concentration, and memory; and her mental health impairments are distinct from

her physical impairments. (Tr. 69, 81). She has difficulty remembering where she parked the car or what happened the prior day; she often needs to re-read sections of a book and gets distracted by other conversations in the room; she has trouble focusing on a conversation when there are other conversations around; she pays the household bills and watches 30-minute tv shows; she attends her son's sporting events but is not social with other parents; she struggles with hoarding but is not formally diagnosed. (Tr. 72-5).

- She attends counseling every other week and sees her psychiatrist every six weeks to two months. (Tr. 70). She began mental health care in 2008 and has not had a break in mental health treatments since December 2012. *Id.* She takes an antidepressant for both her depression and anxiety.

- She indicated that Dr. Gonsalves' opinions on her limitations were not entirely accurate because she met with her in a group setting, and never one-on-one. (Tr. 71). She testified that she only had about ten minutes to discuss herself and did not believe the doctor had a good understanding of her condition, which is why she changed doctors. (Tr. 71).

- Plaintiff's pain is not always related to activity, and she regulates her activities due to pain concerns. (Tr. 77). So long as she does not exceed her limitations, she can manage her pain levels. *Id.*

During the July 31, 2019 hearing, the ALJ limited Plaintiff's testimony to events that took place on or before December 31, 2016, her last insured date. Plaintiff testified as follows:

- On her disability onset date, December 11, 2012, she was struggling to maintain full-time employment due to physical pain, shortness of breath, anxiety, and depression. (Tr. 1209). She could not sustain a whole day of activities. *Id.*

- An average day in December 2016 involved watching television for a few hours, reading, crocheting, washing dishes, doing laundry, and light housekeeping; she shopped for groceries weekly and paid bills; she spends most days at home. (Tr. 1210-11). She has three adult children that are in and out of the house. (Tr. 1211).

- Her attorney confirmed that Plaintiff would stand on her prior hearing testimony. (Tr. 1212).

The ALJ took testimony from Dr. John Kwock, a medical expert and retired orthopedic surgeon. (Tr 1213-14, 3120). Dr. Kwock testified that based upon the record he reviewed, in his opinion, Plaintiff's medically determinable impairments are mild degenerative disc and

18

degenerative joint disease in the lumbar spine and osteoarthritis of both metatarsal joints, although the latter condition was not determinable based upon the record. (Tr. 1213). Dr. Kwock opined that "the impairments singularly would not meet a listing nor would they in combination complete, equal a listing. So she neither meets nor equals any listing." (Tr. 1213). Dr. Kwock provided the following RFC:

> The nature and the severity of the impairments would warrant some limitations. I believe however the record would still support a light work exertional level. That is to say she can lift and carry up to ten pounds on a frequent basis, between 11 and 20 pounds on an occasional basis. But anything above 21 pounds never. There would be a sit, stand and walk parameter. It would be my opinion she can still sit for six hours out of the eight, stand and walk for three hours out of the eight. There are no upper extremity limitations. So for overhead reaching, lateral reaching, handling, fingering, feeling, pushing and pulling of the arms, unlimited bilaterally. There -- use of the feet for pushing pedal, levers, etcetera. She would be frequent bilaterally. Posturals would be appropriate. The climbing of stairs and ramps and the like is frequent. The climbing of ladders, scaffolds and the like is occasional.

> Balancing could still be frequent. Stooping is occasional. Kneeling is frequent. Crouching is occasional. Crawling is never. Environmentals would be appropriate. Working in high, unprotected heights and such is occasional. Working in proximity to heavy or moving machinery would be occasional.

(Tr. 1213-14).

The VE testified that Plaintiff's past work experience was as a professor (skilled, light), a registered nurse (skilled, medium) but performed at very heavy level, and nurse supervisor (skilled, light) but performed at heavy level. (Tr. 1215-16). According to the VE, Plaintiff has no transferrable skills for a direct transfer. (Tr. 1216).

The ALJ posed the following hypothetical question to the VE:

> First person is female, same age, education and work background as Ms. Keyse. This first person can lift, carry 20 pounds occasionally, ten pounds frequently. Can stand, walk three out of eight, can sit six out of eight. Push, pull is constant, foot pedal frequent bilaterally. This person can frequently use a ramp or stairs, only occasionally a ladder, rope or a scaffold. Can frequently balance, occasionally stoop, frequently kneel, occasionally crouch, never crawl. There are no

> manipulative limitations. Reaching, handling, fingering and feeling bilaterally are a constant. No visual limitations, no communications deficits. This person can only occasionally be around dangerous machinery and unprotected heights. Hold on. This person can do tasks that would take more than six months and up to a year to learn. The tasks should not involve high production quotas or piece rate work.

(Tr. 1217). The VE testified that the hypothetical individual could not perform Plaintiff's past work, and with the limitation for standing and walking in three hours and sitting in six, the individual could only perform sedentary work as follows:

> There would be sales jobs such as a telemarketer. That [Dictionary of Occupational Titles (DOT)] code is 299.357-014. That is sedentary and semi skilled with an SVP of 3 and in the nation at least 160,000 jobs. Another would be a clerk roll. The sample title is appointment clerk. That DOT code is 237.367-010. That's sedentary and unskilled with an SVP 2 and in the nation at least 60,000 jobs. A third example would be another clerk roll. The sample title is billing clerk. That code is 214.482-010. That's sedentary and semi skilled, SVP 4.

(Tr. 1217-18).

> The ALJ modified the hypothetical to consider that the individual

> can lift, carry 20 pounds occasionally, ten pounds frequently. Standing and walking is now four out of eight. Sitting six out of eight. This person can frequently stoop, kneel, crouch, balance, and crawl. Can frequently use ramps or stairs, but never a ladder, rope or a scaffold. This person can ne er work in an environment with unprotected heights, moving mechanical parts or involving commercial driving. This person has…unlimited manipulative use of both upper extremities. There are no visual limits, no communications deficits and that's it.

(Tr. 1218-19). The VE testified that this individual could perform Plaintiff's past work as professor and could perform other light, unskilled jobs as follows:

> a cashiering role. The sample title, cashier II. That code is 211.462-010. That is light and unskilled with an SVP 2. I'll reduce the numbers to represent those cashier II whose employers do not consider a stool at the work station an accommodation. It would be a clerk role. The sample title is mail room clerk. That code is 209.687-026. Light, unskilled, SVP 2. In the nation at least 99,000 jobs. A third example -- yeah. This is the one. There would be a stock checking role. The sample title is linen grader. That *DOT* code is 361.687-022. That is light and unskilled with an SVP 2 and in the nation at least 50,000 jobs.

(Tr. 1219).

The VE further testified that a worker absent at the rate of about a day or more a month over a 12 month period would be unable to sustain employment. (Tr. 1222). A worker who is off task 15 percent or more of the time would be unable to sustain employment. (Tr. 1222).

## II.  Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§

404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## III.  Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 11, 2012 through her date last insured of December 31, 2016 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: osteoarthritis, degenerative disc disease of back, dysfunction of major joints, fibromyalgia, obesity, congestive heart failure, and osteoarthritis (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), specifically the claimant can lift and carry 10 pounds frequently and 20 pounds maximum. She can sit for 6 hours in an 8-hour day and stand/walk for 4 hours in an 8-hour day.   Additionally, she can frequently use ramps or stairs, but never use climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, kneel, crouch, or crawl. She cannot work around unprotected heights, moving mechanical parts or work involving commercial driving.

6. Through the date last insured, the claimant was capable of performing past relevant work as a professor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

22

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from December 11, 2012, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

(Tr. 118-120).

## IV.  Law and Analysis

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.  Plaintiff's Assignments of Error

#### 1.  The ALJ's Consideration of Plaintiff's Mental Impairment Evidence

In her first assignment of error, Plaintiff contends that the ALJ erred at Step Two of the analysis by determining that Plaintiff's mental impairments were non-severe. (R. 15, PageID# 3191). She asserts that "the ALJ's erroneous finding at step two in this case cause a "ripple effect" of errors at the subsequent steps of the sequential process." (R. 15, PageID # 3192). Defendant asserts that any failure to find that an impairment was not severe is harmless because the ALJ found Plaintiff had other severe impairments. (R. 17, Page ID# 3217). Thus, Defendant argues, Plaintiff's objection does not lie with the ALJ's Step Two determination, but rather with the ALJ's subsequent RFC determination. (R. 17, PageID # 3218).

The crux of Plaintiff's argument is that "the ALJ's error at step two resulted in a legally insufficient RFC finding (i.e., one that contained no mental limitations whatsoever)." (R. 15, PageID# 3192). Plaintiff acknowledges that "whether the issue in this case is framed as a step 2 error or as an RFC formulation error the primary effect of the ALJ's error is the same: it resulted in an RFC finding that does not address all the limitations that Plaintiff actually has." (R.15, PageID# 3193). Accordingly, Plaintiff's argument is that the RFC determination was not supported by substantial evidence because the ALJ improperly rejected medical opinion evidence regarding her alleged mental impairments at Step Two. Defendant asserts that any error prior to the RFC determination was harmless because the ALJ's RFC determination was supported by substantial evidence. (R. 17, PageID# 3229). For the reasons set forth below, the court concludes that the ALJ failed to properly consider medical evidence and opinions regarding Plaintiff's mental impairments, requiring remand.

a)      **The ALJ's Review of The Agency's Psychological Consultants**

Plaintiff contends that the ALJ failed to consider the opinions of Agency Psychological Consultants, Drs. Haskins, Murry-Hoffman, and Warren. (R. 15, PageID# 3195). Specifically,

Plaintiff contends that the ALJ failed to "even acknowledge, let alone evaluate the opinions of Drs. Haskins, Murry-Hoffman, and Warren" and therefore "meaningful judicial review is impossible since, if a court cannot tell the reasons for an ALJ's finding, it may not affirm the decision based upon supplied rationale and/or factual findings." (R. 15, PageID# 3195). Plaintiff is mistaken, however, as the ALJ set forth the following analysis of the Agency Psychological Consultants, including Drs. Haskins, Murry-Hoffman, and Warren:

> State agency psychological consultant Margaret Bergsten, Ph.D., evaluated the claimant's mental impairments initially and found the claimant did not have a severe mental impairment (Exhibit 1A:5). I give great weight to this assessment because it is consistent with the medical evidence of record.
>
> Upon reconsideration, the State agency psychological consultant Kristen Haskins, Psy.D said the claimant has severe anxiety and affective disorders. She also assessed limits in claimant's mental residual functional capacity (Exhibit 3A:11-13). I give little weight to this opinion, as the record does not support a severe mental impairment prior to the date last insured.
>
> In conjunction with claimant's subsequent Title II application, State agency psychological consultant Robyn Murry-Hoffman reviewed the record on October 25, 2017. She opined the claimant had severe mental impairments prior to the date last insured. Claimant would have difficulty with fast-paced tasks due to anxiety. Claimant was capable of at least superficial interactions. Claimant was capable of handling occasional changes with advanced notice…(Exhibit 7A:8-10). State agency psychological consultant Vicki Warren, Ph.D., reviewed the record on November 29, 2017. She assessed the same limits as State agency psychological consultant Murry-Hoffman (Exhibit 9A:8-10). I give these opinions little weight because they are inconsistent with the evidence of record. Claimant had weaned herself off her anxiety and depression medications by December 13, 2016. She felt better off the medications (Exhibit 26F:84).

(Tr. 1186).

Due to Plaintiff's mistaken contention that the ALJ failed to address these opinions, Plaintiff did not set forth any argument that the ALJ erred in assessing weight to these opinions. Plaintiff does note, however, that "Plaintiff's current treating psychiatrist and therapist opined that she has 'severe' mental impairments, Tr. 727; 895-96; 1172; 2118-19; 2967-69, and three of the

Agency's reviewing psychologists agreed. Tr. 133; 1256; 1270. Each of these psychological sources opined work- related limitations." (R. 15, PageID# 3194).

The court concludes that the ALJ's discussion of the Agency Psychologist opinions is lacking.

> [A]n ALJ is required to evaluate all medical opinions, regardless of source, unless an opinion is a treating source's opinion entitled to controlling weight. *Smith*, 482 F.3d at 875. State agency psychological consultants are considered highly-qualified experts in disability evaluation, and the ALJ must explain any rejection of the state-agency doctor's opinions. The ALJ is required to consider the following factors in deciding the weight to give any medical opinion: the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. §§§ 404.1527(c), 416.927(c); *see generally Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 937. More weight is generally given to the opinion of an examining source than to the opinion of a source who has not examined the claimant. 20 C.F.R. §§§ 404.1527(c)(1), 416.927(c)(1).

*Hicks v. Comm'r of Soc. Sec.*, No. 1:17CV1957, 2018 U.S. Dist. LEXIS 166619, at *31-32 (N.D. Ohio Sep. 27, 2018).

Here, the ALJ assigned little weight to Drs. Haskins, Murry-Hoffman, and Warren, stating without citation or sufficient explanation that their opinions are "inconsistent with the record." Such an incomplete statement does not allow the court to ascertain the merits of the ALJ's conclusions nor does it build an "accurate and logical bridge between the evidence and his conclusion" to reject the opinions of these Agency Psychologists regarding Plaintiff's mental impairments. *Wilson*, 378 F. 3d at 544; *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).

### b)     The ALJ's Review of Plaintiff's Treating Providers

Next, Plaintiff contends that the ALJ failed to provide good reasons for rejecting the opinions of her treating sources regarding her mental impairments. (R. 15, PageID# 3196).

Specifically, Plaintiff asserts that the ALJ failed to properly consider the opinions of Dr. Zuchowski, Ms. Staneff, and Dr. Gonsalves. Regarding Dr. Zuchowski and Ms. Staneff, the court finds that the ALJ failed to properly apply the treating source rule, and therefore remand is necessary.

According to the regulations applicable to decisions made prior to March 27, 2017, it is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.[4] *Gayheart v. Commissioner*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. "Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if [the ALJ] finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations,"

---

[4] Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March that date. 82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017). Plaintiff's claim was filed before March 27, 2017, and the ALJ's initial decision was rendered before the new regulations took effect.

*Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

In addition, it is well-established that ALJs may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (citing *Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

### (1)    Dr. Zuchowski

Plaintiff argues that the ALJ failed to properly consider Dr. Zuchowski's opinions by stating that the "signature was illegible" on her 2016 and 2017 opinions. (Tr. 1185). The Commissioner responds that Plaintiff suggests that the ALJ "should have engaged in handwriting analysis in his evaluation of the medical opinion evidence" and that nonetheless, the ALJ discussed these opinions and explained the weight given. (R. 17, PageID# 3221). The Commissioner's defense misses the mark, however. By determining that the source of the medical reports was illegible, the ALJ could not and did not treat the reports as opinions from a treating provider. As explained herein, that was an error necessitating remand for further consideration.

Regarding the alleged unidentifiable mental status questionnaires and Dr. Zuchowski's opinion, the ALJ stated:

> A mental status questionnaire was completed and signed by someone at Affiliates in Behavioral Health on February 4, 2016 (Exhibit 19F; duplicate at 23F), but the signature and credentials of the person signing the form are illegible. This person said the claimant often has problems with activities of daily living; occasionally isolates to avoid social interaction; often has difficulty managing a low stress situation; and often has problems maintaining concentration, persistence or pace (Exhibit 19F; duplicate at 23F). I give this opinion little weight because it is not consistent with the medical evidence of record. The credentials and treating relationship to claimant are underdetermined due to the illegibility of the signature.

> A mental status questionnaire was completed by an unknown individual, signature again illegible but credentials listed as psychiatrist, on September 25, 2017. Claimant had been receiving treatment from July 24, 2015, through September 25, 2017. Claimant had a depressed mood and affect, but normal flow of conversation. Major depressive disorder, generalized anxiety disorder and hoarding were all ongoing. Claimant was on Ativan for anxiety. Claimant had not been able to tolerate anti-depressants. Her prognosis was fair. She has difficulty with social interaction due to anxiety. Chronic back pain can prevent claimant from going to work (Exhibit 27F:1-3). I give this opinion partial weight. It was completed in September 2017 and it does not specifically address the period prior to December 31, 2016. It also lists claimant's alleged physical limits, of which the person completing the form has no direct knowledge. The diagnoses of anxiety and depression are consistent with the record, although these are not severe impairments. In addition, records

submitted with this form only show the initial intake from July 2015 (Exhibit 27F:5-9) and no records after that date.

Sara Zuchowski, M.D., completed a mental status evaluation on October 26, 2018. She had been seeing the claimant since 2015, every 3-4 months. Occasionally, the claimant showed anxious demeanor. Dr. Zuchowski circled limitations on a pre-printed form. She circled moderate limitations in the ability to respond appropriately to supervision, criticism and redirection; moderate limitations in concentration, persistence and task completion; marked limitations in the ability to adapt or manage oneself; and marked limitations in the ability to understand, remember and apply information (Exhibit 38F). I give this opinion little weight because treating records (Exhibit 40F:14-25) do not support such significant limitation prior to the date last insured. At visits on October 21, 2016 and September 12, 2016, claimant was not taking any psychotropic medications (Exhibit 37F:14-15). She reported she was doing well on June 2, 2016 (Exhibit 37F:17).

(Tr. 1185).

Far from demanding a "handwriting analysis," Plaintiff contends that the signatures on 2016 and 2017 opinions matched Dr. Zuchowski's signature on the 2018 opinion. (R. 15, PageID# 3198, citing Tr. 1172 (Ex. 19F and duplicate at 23F), 2119 (Ex. 27F), 2969 (Ex. 38F)). All three opinions are handwritten; and while the 2016 and 2017 opinions include the provider's signature, only the 2018 opinion includes Dr. Zuchowski's signature and handwritten name. Plaintiff, however, notes that the record contains treatment records from Affiliates in Behavior Health at Exhibits 15F and 37F, clearly identifying Dr. Zuchowski as the author of the progress notes. (R. 15, PageID# 3198, citing Tr. 1056-61; 2942-64). Each of these progress notes contain Dr. Zuchowski's signature. (Tr. 1056-61; 2942-64). The Commissioner acknowledges that Dr. Zuchowski is a treating psychiatrist. (R. 17, PageID# 3221). Although not dispositive, according to the record prepared by the Commissioner for this litigation, Exhibit No. 23F (Tr. 1680), which the ALJ acknowledges as the 2016 mental status evaluation, is attributed to Dr. Zuchowski. (R. 10, PageID# 49).

Further, at the 2016 hearing the ALJ specifically discussed the fact that Plaintiff's counsel brought an updated medical source statement regarding her mental impairments. (Tr. 69). "I understand you brought a more recent treating source statement, but up until the date of the hearing, when I reviewed your file, my impression from the treating source was that the symptoms were mild. ...Who treats your mental impairments?" To which Plaintiff responded, "Currently, it's Dr. Sara Zuchowski. Previously, I had seen Dr. Gonsalves at the Cleveland Clinic. And I also work with a Counselor, Marina Forkosh. And I previously worked with a Counselor, Sara Staneff." (Tr. 69-70). That medical source statement regarding Plaintiff's mental impairment was submitted as Exhibit 19F (Tr. 1172), and as acknowledged by the ALJ's decision acknowledged at Tr. 1185 is a duplicate of Ex. 23F (Tr. 1680).

Most notable, in correspondence dated November 8, 2018, Plaintiff's representative submitted a pre-hearing medical summary at the ALJ's request. (Tr. 1471-72). In that summary, Plaintiff's representative explained:

> As to her mental health, Ms. Keyse is treated by Dr. Zuchowski. Her diagnoses include major depression, recurrent, moderate; generalized anxiety disorder; and fibromyalgia. (13 F) Her symptoms are: low motivation, depressed mood, anxiety, low energy, irritability, poor concentration, sleep disturbance, poor short-term memory, and easy distractibility. (2F, p. 11; MSE submitted) Dr. Zuchowski stated on a mental status evaluation in February 2016 that Ms. Keyse occasionally isolates to avoid social interaction. She often has difficulty maintaining activities of daily living, managing even a low stress situation, and maintaining concentration, persistence and pace. She experiences 7+ bad days per month during which her symptoms are increased and she would not be able to complete an 8 hour work shift. (MSE submitted) She more recently opined that Ms. Keyse was unable to complete even simple tasks on a regular and continuous basis 11-15%) of the time in an 8 hour work day and that she would miss 4 more days of work per month due to her symptoms. (14F) Dr. Zuchowski's and Psychbc records also indicate issues with hoarding and impaired sleep due to pain. (2F, p. 1; 13F, p. 5, 6, 9, 11)

> I am submitting the 2016 opinions of Dr. Knapp and Dr. Zuchowski from her prior file for your convenience given that the files on ARS have not been combined as of this date.

(Tr. 1473).

While it would have been preferable to have type written medical source statements and the printed name below the provider's signature, the court concurs with Plaintiff that, in light of the evidence that Plaintiff was treating with Dr. Zuchowski at Affiliates in Behavior Health, it is reasonable to conclude that Dr. Sara Zuchowski signed each medical source statement and is the author. (Tr. 69-70, 1056-61, 1172, 1472, 2119, 2942-64, 2969). On this record, given the ALJ's uncertainty as to the author(s) of the medical opinions, he should have reviewed the pertinent records referenced above and, perhaps more easily, should have inquired during the hearing. See, *Britton v. Comm'r of Soc. Sec*., No. 1:19CV0668, 2020 U.S. Dist. LEXIS 10246, at *19-20 (N.D. Ohio Jan. 2, 2020), citing *Ferguson v. Comm'r of Soc. Sec*., 628 F.3d 269, 273 n.2 (6th Cir. 2010) (evidence from treating physician containing ambiguity requires clarification); *Maes v. Astrue*, 522 F.3d 1093, 1097-1098 (10th Cir. 2008) (ALJ's duty to clarify evidence); *Morgan v. Colvin*, 68 F. Supp. 3d 1351, 1356-1357 (D. Colo. 2014) (duty of ALJ to clarify where treating source record contains ambiguity); *Pullum v. Astrue,* 675 F. Supp. 2d 299, 313 (W.D.N.Y. 2009) (ALJ has duty to develop complete medical record); *Rivera v. Barnhart*, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)) (ALJ has obligation to fully develop the record); *Ynocencio v. Barnhart*, 300 F. Supp. 2d 646, 657 (N.D. Ill. 2004) (ALJ's duty to develop full and fair record; ALJ must clarify ambiguity in medical source record).

In addition, if an ALJ determines not to give a treating source controlling weight, he must still determine how much weight to assign by applying the specific factors set forth in the governing regulations; the length, frequency, nature, and extent of treating relationship, as well as the doctor's area of specialty and the degree to which the opinion is consistent with the record as

a whole and is supported by relevant evidence. *Shields*, 732 Fed. App. at 437; *Gayheart*, 710 F. 3d at 376; 20 C.F.R. § 404.1527(c). Regarding the 2016 opinion, the ALJ concluded that "I give this opinion little weight because it is not consistent with the medical evidence of record. The credentials and treating relationship to claimant are underdetermined due to the illegibility of the signature." (Tr. 1185). The ALJ erred by not sufficiently considering the record and identifying evidence to support this determination. Thus, the ALJ failed to apply the treating source doctrine.

This error impacts the ALJ's determination regarding weight of the 2017 and 2018 medical opinions. In dismissing both of these opinions, the ALJ explained that the opinions did not address Plaintiff's condition prior to her last insured date of December 31, 2016. (Tr. 1185). However, the ALJ should consider that these three opinions were provided by the same treating provider after regular treatment with Plaintiff. Further, the ALJ notes that regarding the 2017 opinion "records submitted with this form only show the initial intake from July 2015 (Exhibit 27F:5-9) and no records after that date." (Tr. 1185). As noted above, the administrative record contains treatment records from Dr. Zuchowski at Affiliates in Behavioral Health, from 2015 to 2018, at Exhibits 15F and 37F. (Tr. 1056-61; 2942-64).

Regarding Dr. Zuchowski's 2018 opinion, the ALJ stated "I give this opinion little weight because treating records (Exhibit 40F:14-25) do not support such significant limitation prior to the date last insured. At visits on October 21, 2016 and September 12, 2016, claimant was not taking any psychotropic medications (Exhibit 37F:14-15). She reported she was doing well on June 2, 2016 (Exhibit 37F:17)." (Tr. 1185).

Again, the ALJ failed to recognize and consider this opinion in light of the 2016 and 2017 opinions. For example, in putting significant weight on the fact that Plaintiff was not taking any psychotropic medications at the end of 2016, the ALJ failed to consider this evidence in

conjunction with the 2017 opinion, which explained that Plaintiff was "unable to tolerate antidepressents." (Tr. 1185). This is bolstered by treating records indicating that Plaintiff stopped taking antidepressents due to side effects. (Tr. 2954-56). Dr. Zuchowski's treatment records indicate that she and Plaintiff left open the possibility of resuming such medication. *Id.* By failing to consider all of Dr. Zuchowski's opinions, the ALJ did not consider the entire record regarding the waxing and waning of Plaintiff's symptoms, 20 C.F.R. § 404, Subpt. P, App. 1, 12.00F(4), and the court cannot determine that substantial evidence support the ALJ's conclusion. Therefore, this matter is remanded for further consideration of Dr. Zuchowski's opinion.

However the court's opinion should not be construed as suggesting any particular weight be afforded to the provider's opinion(s) after further consideration.

### (2)  Sara Staneff

Plaintiff contends that the ALJ erred in giving her treating psychologist, Sara Staneff's opinion "little weight" because she referred to physical limitations in her opinion. (R. 15, PageID# 3199).

The ALJ addressed Ms. Staneff's opinion, as follows:

Sarah Staneff, psychologist, completed a mental status questionnaire and an activities of daily living questionnaire regarding the claimant on May 21, 2014 (Exhibit 4F). She first saw the claimant on November 2, 2012 and had last seen the claimant on May 21, 2014. Psychologist Staneff said the claimant had difficulty with interpersonal conflict and minimized issues that were hard for her to deal with. Claimant was depressed and anxious (Exhibit 4F:3). Psychologist Staneff said the claimant could likely perform simple, routine, repetitive tasks but was limited in lifting and standing for long periods (Exhibit 4F:4). She also has difficulty standing and lifting, which might affect work activities (Exhibit 4F:6). These statements are given little weight as they are based on claimant's subjective physical complaints. Psychologist Staneff is a mental health provider.

Psychologist Staneff completed additional questionnaires on October 15, 2014, with the same limits (Exhibit 9F, 10F, 11F, 16F:13-18). Again, these are given little weight, as they are not consistent with the medical evidence of record. She also

again refers to alleged physical limits (Exhibit 10F:2), of which she has no direct knowledge. She is not treating the claimant for physical impairments.

(Tr. 1184).

Regarding Ms. Staneff's May 21, 2014 opinion, the ALJ gave her statements regarding Plaintiff's *physical* complaints little weight because she is a mental health provider and therefore her knowledge of Plaintiff's physical complaints was limited to Plaintiff's subjective statements. (Tr. 1184). It is unclear, however, the weight the ALJ assigned to any of her statements regarding Plaintiff's *mental* health.

It is not disputed that Ms. Staneff was Plaintiff's treating psychologist. The ALJ acknowledged that Ms. Staneff treated Plaintiff from November 2012 to May 2014. (Tr. 726, 1184). In her May 21, 2014 opinion, Ms. Staneff set forth various limitations due to Plaintiff's mental health impairments. (Tr. 726). The ALJ erred by failing to consider and to afford any weight to these statements. *Shields*, 732 Fed. App. at 437; *Gayheart*, 710 F. 3d at 376; 20 C.F.R. § 404.1527(c).

The ALJ summarily states that little weight is given to Ms. Staneff's October 15, 2014 opinion stating only that "these are given little weight, as they are not consistent with the medical evidence of record. She also again refers to alleged physical limits (Exhibit 10F:2)[.]" (Tr. 1184). There is no indication that the ALJ applied the specific factors set forth in 20 C.F.R. § 404.1527(c). *Shields*, 732 Fed. App. at 437; *Gayheart*, 710 F. 3d at 376; 20 C.F.R. § 404.1527(c). The matter is remanded for a more thorough consideration of Ms. Staneff's aforementioned opinions.

### (3)    Dr. Gonsalves

Plaintiff contends that the ALJ erred by giving Dr. Gonsalves' opinion "great weight." (R. 15, PageID# 3199). The ALJ stated:

> Records from the Cleveland Clinic show mental health treatment from Lilian Gonsalves, M.D. These records show claimant's thought processes were logical, coherent, and rational. Recent and remote memory were intact. Concentration was normal (Exhibit 5F:8, 14, 20, 26, 31, 37, 43, 49). Diagnoses are listed as mood disorder, and major depressive disorder, recurrent, moderate (Exhibit 5F).
>
> …
>
> Dr. Gonsalves completed a mental status questionnaire in June 2014 (Exhibit 6F; duplicate at 13F). She said claimant's diagnosis was major depressive disorder, recurrent, moderate. Claimant also had symptoms of anxiety, panic, poor motivation, and difficulty concentrating (Exhibit 6F:2). She said claimant had no limits in activities of daily living (Exhibit 6F:2); mild limits in social functioning and concentration, persistence and task completion (Exhibit 6F:3). When asked if claimant could engage in work activity for 8 hours a day, day after day, on a continued basis, she said claimant would like to pursue a part-time position (Exhibit 6F:3). This statement does not really answer the question. I give great weight to the limits in activities of daily living, social functioning and concentration, persistence and task completion, as they are consistent with the treating notes.

(Tr. 1184).

Plaintiff takes primary issue with the ALJ's discussion of Dr. Gonsalves' opinion because of the errors she set forth regarding the ALJ's treatment of Ms. Staneff's opinions. (R. 15, PageID# 3200). Essentially, Plaintiff contends the ALJ erred by assigning more weight to Dr. Gonsalves over Ms. Staneff. Such an argument fails as it is not properly before this court. It is not the court's function to re-weigh the opinions of record. This court "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 2011 WL 1228165 at *2 (6th Cir. 2011) (c*iting Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).

As the court concluded, *supra,* the ALJ failed to properly consider the opinions of the agency psychologists and Plaintiff's treating providers, requiring remand. Although the Commissioner defends the ALJ's decision and residual functional capacity (RFC) assessment, the

ALJ's deficient analysis of Plaintiff's treating physicians and the State Agency physicians prevents the court from meaningfully analyzing the reasoning behind the ALJ's analysis or concluding that the RFC accurately describes Plaintiff's abilities. Accordingly, the ALJ's decision is not supported by substantial evidence. *See, e.g., Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).

Further, the incomplete analysis of the evidence regarding Plaintiff's mental impairments permeates the remainder of the ALJ's decision. For example, at Step Three, the ALJ made no mention of Plaintiff's mental impairments, even as non-severe impairments. The ALJ was required to review all evidence of impairments to determine if the sum of impairments were medically equivalent to a listed impairment. 20 C.F.R. § 404.1526. This is particularly relevant in cases involving fibromyalgia because there is no listing for fibromyalgia. *Rodway v. Comm'r of Soc. Sec.*, No. 1:18CV0169, 2019 U.S. Dist. LEXIS 21805, at *18-19 (N.D. Ohio Jan. 24, 2019) (finding that the ALJ should have determined whether claimant's fibromyalgia medically equaled a listing, or whether it combined with at least one other medically determinable impairment medically equaled a listing).

### 2. The ALJ's Consideration of Medical Opinion Evidence Regarding Physical Impairments

In her second assignment of error, Plaintiff contends that the ALJ erred by failing to properly assess the medical opinions of Dr. Kwock and Dr. Knapp regarding her physical impairments. (R. 15, PageID# 3205).

### a) Dr. Knapp

Plaintiff argues that the ALJ failed to provide a reasoned basis for rejecting Dr. Knapp's work-preclusive opinions. (R. 15, PageID# 3206). The Commissioner counters that the ALJ

adequately explained his determination that Dr. Knapp's opinion was not entitled to controlling weight because it was inconsistent with substantial evidence. (R. 17, PageID# 3225).

A 2018 decision from this court remanded this case, concluding that the ALJ failed to provide a reasonable basis for largely rejecting Dr. Knapp's opinion. (Tr. 1298). In so doing, the court explained,

> the ALJ outlines the restrictions that Dr. Knapp assessed, but does not address the bases for the opinions. The ALJ simply states that Dr. Knapp's opinions are 'inconsistent with the medical evidence of record, especially the normal neurological findings and normal gait.' While it is clear what weight the ALJ is assigning to Dr. Knapp's opinions ("little weight"), the reasons for that weight are insufficient and vague. The ALJ does not identify evidence to support that statement that Dr. Knapp's opinions are 'inconsistent with the medical evidence of record.' The record often demonstrates, for example, that Keyse had normal range of motion, as the ALJ notes, but at the same time the record is replete with reports of claimant's complaints of pain arising from her diagnosed conditions of fibromyalgia and osteoarthritis. The ALJ failed to provide a 'reasoned basis for largely rejecting the treating physician's opinions.

(Tr. 1298, citations omitted).

In her current appeal, Plaintiff contends that the ALJ again failed to address the pain aspect of her severe impairments, despite the court's previous statement that "the record is replete with reports of claimant's complaints of pain[.]" (Tr. 1298). Therefore, Plaintiff contends, the ALJ failed to provide a reasoned basis for rejecting Dr. Knapp's work-preclusive opinions. The court does not agree.

Here, the ALJ's discussion of Dr. Knapp's 2014 and 2016 opinions is similar to the ALJ's analysis in 2016. However, in line with the court's remand, the ALJ expanded the analysis, supported it with additional record citations, and provided further explanations to support his conclusion, as emphasized in the following excerpt. In reviewing Dr. Knapp's opinion, the ALJ stated:

Joseph Knapp, M.D., claimant's primary care physician, completed a physical capacity evaluation on July 14, 2014 (Exhibit 6F:5-7). Dr. Knapp treats the claimant at the Cleveland Clinic. Dr. Knapp said the claimant can stand/walk 2 hours in an 8-hour day; sit for 3 hours in an 8-hour day; and lift 11-20 pounds. She can use her hands for pushing and pulling, but not simple gasping or fine manipulation (Exhibit 6F:5). He said claimant cannot use her feet for repetitive movements in operating foot controls. She can occasionally bend and climb; never crawl;frequently look down; occasionally lift overhead; and frequently turn her head to the left or right. Onset of total disability was December 2012. Claimant needed rest breaks in excess of those usually provided. She would miss work 5-10 days a month. Emotional factors contributed to the severity of claimant's symptoms. Seven or more trigger points were present (Exhibit 6F:6). Pain interferes with claimant's ability to concentrate (Exhibit 6F:7). A physical capacity evaluation signed by Dr. Knapp on July 14, 2014, gives the same limits (Exhibit 12F). Although Dr. Knapp is a treating physician, I do not give these opinions controlling weight. I give these opinions little weight, as they are inconsistent with the medical evidence of record, especially the normal neurological findings and normal gait. **Discharge notes from occupational therapy at the Cleveland Clinic (where Dr. Knapp treated the claimant) in April 2014 showed claimant was able to lift 50 pounds floor to waist and carry 42 pounds for 25 feet at discharge. Her physical demand level initially and upon discharge was medium (Exhibit 7F:53). The record does not indicate a significant new impairment or decline in functioning to support reducing claimant's lifting ability to 20 pounds maximum only three months later. Clinical findings show joint pain with functional range of motion retained, and without neurologic impairment, motor weakness or gait impairment (Exhibit 2F:77, 109, 149, 185, 228; 3F:24, 32; 7F:27; 14F:99; 44F:6). These findings do not support the limits assessed by Dr. Knapp. Records show Dr. Knapp performed general exams, but did not check range of motion or conduct neurological exams (Exhibit 26F).**

Dr. Knapp also completed a medical source statement on February 3, 2016 (Exhibit 18F; duplicate at 22F). He said the claimant can stand/walk or sit for 30-45 minutes at a time. After this amount of activity, she would need to stand and move about for 5-10 minutes. She can lift up to 10 pounds repeatedly. He cited additional nonexertional and postural limits. He said claimant would often require additional breaks during a workday in excess of usual breaks (Exhibit 18F; duplicate at 22F). **Again, this opinion is not supported by the clinical findings, which show joint pain with functional range of motion retained, and without neurologic impairment, motor weakness or gait impairment (Exhibit 2F:77, 109, 149, 185, 228; 3F:24, 32; 7F:27; 14F:99; 44F:6).**

…

Dr. Knapp completed a medical source statement on November 6, 2018 (Exhibit 39F). He listed claimant's diagnoses as undifferentiated inflammatory arthritis and

fibromyalgia.   She has pain in the shoulders, trapezius, and legs. Clinical findings include tenderness upon palpation in the spine, trapezius, lateral hips, and muscles of all four extremities. He said the claimant can stand/walk or sit for 15-30 minutes at a time. After this amount of activity, she would need to rest for 10-15 minutes. The claimant can stand/walk for a total of 2-4 hours in an 8-hour day. She can sit for 15-30 minutes at a time, then she needs to rest for 10-15 minutes. She can sit for a total of less than 2 hours in an 8-hour day. She can lift up to 10 pounds repeatedly. He cited additional nonexertional and postural limits. He said claimant would often require additional breaks during a workday in excess of usual break. She would not be able to complete an 8-hour day more than 4 days per month, He wrote these limitations started in December 2012 (Exhibit 39F). Again, this opinion is not supported by the clinical findings, which show joint pain with functional range of motion retained, and without neurologic impairment, motor weakness or gait impairment (Exhibit 2F:77, 109, 149, 185, 228; 3F:24, 32; 7F:27; 14F:99; 44F:6).

(Tr. 1191-92, emphasis added).

If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner,* 658 Fed. App'x at 253-254. These good reasons must be supported by evidence in the record and be sufficiently specific to make clear the weight assigned to the treating physician's opinion, and the reason for that weight. *Gayheart*, 710 F.3d 376; *Blakley*, 581 F.3d at 406-407; *Winning*, 661 F. Supp.2d at 818-819. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

Regarding the 2014 opinions, the ALJ supported his inconsistency findings by pointing to occupational therapy notes from April 2014 showing that Plaintiff could lift 50 pounds floor to waist and carry 42 pounds for 20 feet. (Tr. 1191-92, citing Tr. 850). The ALJ explained that there was nothing in the record to establish a significant decline in function in the three months between the occupational therapy notes and Dr. Knapp's conclusion that Plaintiff was limited to lifting 20 pounds. (Tr. 1192). Further, the ALJ repeatedly states "Clinical findings show joint pain with

functional range of motion retained, and without neurologic impairment, motor weakness or gait impairment (Exhibit 2F:77, 109, 149, 185, 228; 3F:24, 32; 7F:27; 14F:99; 44F:6)." (Tr. 1191-92). Thus, the ALJ acknowledged Plaintiff's joint pain, but cited to various records that indicated her pain did not affect her range of motion, neurological impairment, motor weakness or gait impairment. (Tr. 1191-92, citing Tr. 415, 447, 566, 685, 824, 1008, 3057). The ALJ has satisfied the regulation requirements regarding his analysis of Dr. Knapp's opinions.

### b)     Dr. Kwock

Plaintiff asserts that although the ALJ purportedly gave great weight to Dr. Kwock's opinion, he failed to include some of the stated limitations in the RFC. (R. 15, PageID# 3205). The ALJ stated:

> John Kwock, M.D., testified as a medical expert. His credentials are set forth at Exhibit 46F. He listed claimant's severe impairments as mild degenerative joint disease in the lumbar spine, osteoarthritis of the metatarsal joints of both the right and left foot. Dr. Kwock testified the claimant is limited to light exertion. Claimant can lift and carry up to 10 pounds on a frequent basis and between 11-20 pounds occasionally. He opined claimant can sit for 6 hours in an 8- hour day and stand/walk for 3 hours in an 8-hour day. Claimant [sic] use her feet frequently bilaterally for pushing pedals, levers, etc. Climbing of ramps, stairs, and the like is frequent. Climbing of ladders, scaffolds and the like is occasional. Claimant was able to frequently balance, occasionally stoop, frequently kneel, occasionally crouch, and never crawl. Claimant can occasionally work at unprotected heights or around heavy moving machinery. I give this opinion great weight. Claimant's activities in an average day support standing/walking for 4 hours in an 8-hour day and frequently stooping, kneeling, crouching or crawling.

(Tr. 1191). The fact that the ALJ assigned "great weight" to Dr. Kwock's opinion does not require the ALJ to adopt all the stated limitations. *Conway v. Berryhill*, Case No. 1:18-cv-00218, 2018 U.S. Dist. LEXIS 220999, at *19 (N.D. Ohio Dec. 17, 2018). Here, the ALJ gave Dr. Kwock's opinion great weight, but determined that Plaintiff's daily activities supported a limitation to standing and walking for four hours instead of three, frequent stoop and crouch rather than

occasionally, and frequent crawl rather than never. (Tr. 1191). The ALJ, however, does not cite to any support in the record for this conclusion, nor adequately explain how Plaintiff's daily activities support different limitations from those opined to by Dr. Kwock.

The ALJ summarized Plaintiff's testimony regarding her daily activities as follows:

The claimant testified at the hearing on July 31, 2019. Prior to her date last insured of December 31, 2016, claimant testified she had trouble getting out of the house on a regular basis. She said she had physical pain, shortness of breath, anxiety, and depression. She said she did not know if she could sustain a full day of activities. Heart functioning caused shortness of breath. She testified she had pain everywhere. At the time, she was seeing a psychologist.

The claimant testified as to average day prior to December 31, 2016. Her days varied. She would wake up, make coffee, and watch television for a few hours. She would crochet in a chair. Some days she showered, but some days she did not shower. She did the dishes and laundry. She paid her bills. The claimant made phone calls. She spent most of her time at home. She did vacuuming and light housekeeping. Claimant sometimes read or meditated. She drove herself to doctor's appointments. She went grocery shopping once a week. She did some cooking. She was living with her husband. Claimant has three adult children who were 'in and out of the house.'

(Tr. 1188).

The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 1189). Thus, the ALJ discredits Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms by stating that it was inconsistent with the medical evidence, but also concludes that the limitations set forth by Dr. Kwock were inconsistent with Plaintiff's testimony regarding her daily activities. (Tr. 1188-89). Without a more thorough explanation, the ALJ's circular reasoning fails to build a logical bridge between the medical evidence and his conclusion that Plaintiff's daily activities supported standing/walking for four hours in an eight-hour day and frequently stooping,

42

kneeling, crouching or crawling.

Regarding the standing/walking limitations, the Commissioner argues that "the ALJ's deviation by one additional hour from Dr. Kwock's standing and walking limitation had no effect on the outcome." (R. 17, PageID# 3226). While it may appear an immaterial deviation, Plaintiff argues that this error is not harmless, because the VE testified that an individual with limitations including three hours of standing/walking would be reduced to sedentary work and could not perform her past relevant work. (R. 15, PageID# 3207; Tr. 1217). Conversely, the same hypothetical individual, who could stand and walk four out of eight hours, could perform Plaintiff's past work as a professor, as well as other light work. (Tr. 1219). In other words, the VE testified that the one-hour difference in walking/standing was the difference between sedentary and light work and whether Plaintiff could perform her past work. Plaintiff argues, moreover,

> the inclusion of the 3-hour stand/walk limitation in the RFC would preclude Plaintiff from her past relevant work as a professor, and step 4 would be resolved in her favor. …[T]he ALJ would then necessarily proceed to step 5, where the initial query is consideration of the Grid Rules. If Plaintiff is limited to sedentary exertion work, the Grid Rule 201.14 would unequivocally direct a finding of 'disabled' based on her vocational factors (i.e. individual closely approaching advanced age, with a high school education and no transferable skills).

(R. 15, PageID# 3207).

The court concludes that the ALJ's decision provides insufficient explanation to build a logical bridge between the medical evidence and use of a four-hour standing requirement in the RFC. Based upon the testimony of the VE, this error is not harmless. Accordingly, this matter must be remanded for further proceedings to enable the Commissioner the opportunity to further assess the record, Dr. Kwock's opinion, and pertinent evidence regarding these RFC limitations; and, if necessary, to render a more thorough explanation.

**V.      Conclusion**

For the foregoing reasons, the court finds that the Commissioner's final decision is not supported by substantial evidence. The decision of the ALJ is vacated and remanded for proceedings consistent with this opinion.

IT IS SO ORDERED.

*s/ David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: March 31, 2021